AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

### for the

Southern District of Florida  ▼

| | |
|---|---|
| United States of America<br>v.<br>**MICHAEL LIGOTTI**<br><br><br><br><br>_____<br>*Defendant(s)* | )<br>)<br>)  Case No.<br>)      20-8265-BER<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of     January 1, 2013 to the present     in the county of     Palm Beach and Broward     in the

     Southern     District of     Florida     , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1349 | Conspiracy to commit health care fraud and wire fraud |
| 18 U.S.C. 982(a)(7) | Criminal forfeiture |

This criminal complaint is based on these facts:

Please see the attached affidavit of Special Agent Christian Hull, Federal Bureau of Investigation ("FBI"), which is attached hereto and incorporated fully herein by reference.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Christian Hull, FBI
*Printed name and title*

Sworn and attested to me by applicant
by telephone (FaceTime) per the requirements
of Fed. R. Crim. P. 4(d) and 4.1

Date:     07/29/2020

_____
*Judge's signature*

City and state:     West Palm Beach, Florida

Hon. Bruce Reinhart, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Special Agent Christian Hull, being duly sworn, do hereby and depose and state:

### Affiant's Background

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been employed in this capacity since July 2019. I am currently assigned to a squad in the Palm Beach Resident Agency of the Miami Division that investigates a wide variety of federal crimes, including health care fraud, money laundering, and unlawful distribution and dispensing of controlled substances. Prior to joining the FBI, I worked as a police officer and ultimately as a detective in the Robbery/Homicide/Sexual Assault Unit for another law enforcement agency.

2.     I am personally involved in conducting a joint investigation with other federal, state, and local law enforcement agencies into alleged criminal activities perpetrated by DR. MICHAEL LIGOTTI ("LIGOTTI"), the owner of primary care and addiction treatment clinic Whole Health, LLC ("Whole Health"), as well as several of his staff members and associates. The information contained in this Affidavit is based upon a review of public and private records, interviews, and other investigative activities conducted by law enforcement personnel assigned to this case.

3.     I am submitting this Affidavit in support of a criminal complaint charging LIGOTTI with conspiracy to commit health care fraud and wire fraud, in violation of 18 U.S.C. § 1349, and in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search:

> a.   The premises of Whole Health, located at 402 SE 6th Avenue, Delray Beach, Florida 33483, in Palm Beach County, in the Southern District of Florida

(more particularly described in Attachment A) for the items described in Attachment C; and

    b.  One Apple iPhone XS Max cellular telephone belonging to LIGOTTI (more particularly described in Attachment B) for the items described in Attachment D.

4.    Because this Affidavit is provided for the limited purpose of establishing probable cause for an arrest and search warrant, I have not included all information known to me regarding this investigation, but rather have set forth only those facts necessary to establish probable cause to believe that the defendant has committed the charged offense and that Whole Health and LIGOTTI's cellular telephone contain evidence of crimes, fruits of crime, and property designed for use, intended for use, or used in various crimes

**The Search Locations**

5.    Whole Health is located at 402 SE 6th Ave, Delray Beach, Florida 33483, in Palm Beach County, in the Southern District of Florida, as more particularly described in Attachment A (incorporated fully herein by reference).

6.    LIGOTTI's Apple iPhone XS Max cellular telephone is identified by International Mobile Subscriber Identity (IMSI) 310410216579641, International Mobile Station Equipment Identity (IMEI) 353093104988769, and associated with AT&T telephone number (561) 809-7960, as more particularly described in Attachment B (incorporated fully herein by reference).

7.    I have probable cause to believe that evidence of, fruits of, and property pertaining to the following crimes, as set forth in Attachments C and D, will be found at the above search locations.

    a.  Conspiracy to commit health care fraud and wire fraud, in violation of 18 U.S.C. § 1349;

    b.  Substantive health care fraud, in violation of 18 U.S.C. § 1347;

    c.  Substantive wire fraud, in violation of 18 U.S.C. § 1343;

    d.  Money laundering, in violation of 18 U.S.C. §§ 1956 and 1957;

    e.  Conspiracy to distribute, dispense, and possess with intent to distribute and dispense controlled substances in violation of 21 U.S.C. § 846; and

    f.  Substantive distribution, dispensing, and possession with intent to distribute and dispense controlled substances, in violation of 21 U.S.C. § 841(a)(1).

## The Charged Offense

8.    Federal law makes it a crime for anyone to knowingly or willfully execute or attempt to execute a scheme or artifice: (1) to defraud any health care benefit program or (2) to obtain by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by or under the custody or control of a health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services. 18 U.S.C. § 1347(a). Conspiracies and attempts to commit health care fraud also are violations of federal law. 18 U.S.C. § 1349.

9.    To be convicted of healthcare fraud, one need not have actual knowledge of 18 U.S.C. § 1347(a) or the specific intent to violate it. 18 U.S.C. § 1347(b).

10.    A "health care benefit program" is defined as "any public or private plan to contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." 18 U.S.C. § 24(b). In this

case, LIGOTTI billed private insurance policies and Affordable Care Act insurance plans, both of which fall within the definition of "health care benefit programs."

11.     Federal law also makes it a crime for anyone who, having devised or intending to devise any scheme or artifice to defraud, to transmit or cause to be transmitted "by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures or sounds for the purpose of executing such scheme or artifice." 18 U.S.C. §1343.

### The Defendant and His Medical Practice

12.     According to the Florida Department of Health, LIGOTTI is an Osteopathic Physician, License Number OS9035, which was issued on September 10, 2003. The license is clear and active and expires on March 31, 2022.

13.     On July 20, 2005, LIGOTTI filed documents with the Florida Secretary of State, effectively organizing and incorporating Whole Health as a medical clinic, with its principal place of business later noted on subsequent corporate filings to be at 402 SE 6th Avenue, Delray Beach, Florida 33483, in Palm Beach County, in the Southern District of Florida. Whole Health advertises its practice as an urgent care facility, a family doctor, and an addiction treatment medical office; however, the majority of Whole Health's patients are insured individuals who are addicted to substances such as drugs and alcohol.

14.     LIGOTTI is the ultimate decision-maker at Whole Health, and he is the only physician at the practice. He employed TARGET 2 as his office manager. TARGET 2, alongside LIGOTTI, would interview prospective employment candidates.

15.     LIGOTTI and his staff of nurse practitioners ("NPs") and Physician's Assistants ("PAs"), collectively the "Medical Staff," purportedly provide medical treatment to patients both onsite at Whole Health and in some instances offsite at partner facilities. During office visits,

Whole Health patients are often required to submit blood and urine specimens that are tested at Whole Health's in-house laboratory, or at external laboratories located throughout the country.

16.     LIGOTTI and his Medical Staff prescribed many opioid-addicted patients buprenorphine[1] in the form of Suboxone, Subutex, and Zubsolv. From in or around 2012 to in or around 2020, LIGOTTI prescribed more than 265,000 pills of buprenorphine to more than 2,800 patients.

17.     Services provided by Whole Health staff are billed to the patients' insurance companies for reimbursements to be made to Whole Health. From on or about May 1, 2011 to on or about March 31, 2020, Whole Health submitted more than $235 million in claims to five private insurance companies and Medicare, and received over $30 million in payment.

18.     In addition to billings submitted by Whole Health, between on or about January 1, 2013 until on or about February 3, 2020, LIGOTTI authorized sober homes and addiction

---

[1] Buprenorphine is a Drug Enforcement Administration ("DEA") Schedule III opioid that has a strong potential for abuse. It is the only medication approved for the treatment of opioid abuse disorder that can be dispensed by a pharmacy and used at home. Buprenorphine can suppress withdrawal symptoms, decrease opioid cravings, and block the effects of other opioids. As detailed further herein in paragraphs 33-35, Suboxone and Zubsolv are commercial names for buprenorphine combined with naloxone, an opioid antagonist. Subutex is the commercial name for buprenorphine without naloxone. If a substance containing buprenorphine and naloxone is crushed and snorted or injected, the naloxone effect can block buprenorphine's euphoric effects and potentially bring on opioid withdrawal symptoms. Because it lacks naloxone, Subutex is generally prescribed to pregnant women and individuals who are allergic to naloxone. While Suboxone, Zubsolv, and Subutex have been approved by the Food and Drug Administration ("FDA") for clinical use in connection with treatment of opioid dependency, because buprenorphine is itself an addictive opioid and its side effects mirror those of other opioids, it can be misused, and safety precautions and clinical guidelines must be followed. Its use is heavily regulated at both federal and state levels. Clinicians are responsible for ensuring that medications like buprenorphine, with high potential for misuse, diversion, and abuse, are used with caution to ensure patients are taking them appropriately and not diverting them. A drug test that is positive for an opioid, such as morphine, and does not show signs that the patient is taking their prescribed buprenorphine, should prompt the healthcare provider to consider a change in the treatment plan, including ending the buprenorphine prescription, since the patient may be diverting the drug.

treatment facilities he partnered with, often as their Medical Director, to bill insurance companies approximately an additional $66.9 million in claims, of which $17.5 million was paid.

19.     Furthermore, LIGOTTI authorized excessive laboratory testing for patients from these sober homes and addiction treatment facilities, which resulted in approximately $379 million in additional submitted claims from on or about January 1, 2013 to on or about March 3, 2020, and approximately $73.6 million in payments to laboratories.

20.     Adding these amounts together, the volume of claims that LIGOTTI and his conspirators submitted and caused to be submitted exceeds approximately $681 million billed and $121.9 million paid by Medicare and private insurance companies.

21.     Insurance claims and payments are generally submitted to and paid by insurers via wire communications. A review of the billing and bank records shows this was in fact the case at Whole Health, and that LIGOTTI was aware of this.

22.     As detailed more comprehensively later in this Affidavit, LIGOTTI has engaged in illegal conduct that includes a) quid pro quo referral relationship agreements with both indicted and unindicted co-conspirators, wherein LIGOTTI agreed to become a Medical Director at an addiction treatment facility or sober home, and authorized unnecessary and duplicative testing through standing orders for testing of addicted patients at these facilities, in exchange for a requirement that these facilities bring their patients to Whole Health, allowing LIGOTTI and Whole Health to bill medical treatment for their patients at his own clinic; b) insurance billing fraud, to include billing for services not rendered and billing for medically unnecessary services; and c) unlawfully dispensing and distributing controlled substances, specifically, buprenorphine.

**Background on Drug and Alcohol Rehabilitation**

23. In recent years, South Florida, particularly Palm Beach and Broward Counties, have become destinations for drug and alcohol addicts seeking assistance in becoming and remaining sober. Reports estimate treatment for substance abuse is Palm Beach County's fourth largest industry, with revenues in excess of $1 billion per year. Substance abuse treatment is regulated under state and federal law, which describe a continuum of care including, from most intensive to least intensive, inpatient detox, partial hospitalization ("PHP"), intensive outpatient ("IOP"), and outpatient ("OP"). Persons undergoing treatment on an outpatient basis, whether in PHP, IOP, or OP, will elect to live in a "recovery residence," also known as a "sober home" or "halfway house," with other persons who are also in treatment and committed to a drug- and alcohol-free lifestyle. While these terms for the residences are commonly interchanged, they are referred to herein as "sober homes."

24. Detox is meant for individuals who are still addicted to and using controlled substances and/or alcohol. Detox facilities are inpatient facilities where patients are assisted in dealing with the effects of withdrawal from the complete cessation of using drugs and/or alcohol. After successfully completing detox, patients receive treatment for their underlying addiction in the form of outpatient care, either through PHPs, IOPs, and OPs. PHP, IOP, and OP patients attend facilities on an ongoing basis where treatment is rendered, generally in the form of therapy sessions. The distinction between the three relates to the amount of therapy time on a daily or weekly basis, and patients generally transition from detox to PHP, then to IOP, and finally to OP as they overcome their addiction.

25. Medical and osteopathic doctors play an essential role in substance abuse treatment. Without a doctor, patients at the substance abuse treatment centers would not receive prescriptions

7

for drugs, receive treatment, or have urine, blood, or other bodily fluid testing. Bodily fluid tests, which are prescribed by the doctors, are billed to health plans by the substance abuse treatment centers, as are patient evaluations performed by a physician.

26.     Title 18, United States Code, Section 24(b), defines "health care benefit program" as "any public or private plan or contract, affecting commerce, under which any medical benefit, item or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract."

27.     Private insurance companies, including Blue Cross Blue Shield ("BCBS"), Humana, Aetna, United HealthCare, Cigna, and others, offer health care coverage directly to consumers and through employers, including ERISA and non-ERISA plans. They also manage health care plans offered to federal employees. All of these health care plans (jointly referred to as "the health plans") affect commerce and are "health care benefit programs" for purposes of 18 U.S.C. § 24(b). The health plans cover medical and clinical treatment costs of rehabilitation in accordance with the terms of their policies and state and federal law, including requirements that testing and treatment be medically necessary, provided by properly licensed facilities, and provided in accordance with the terms of the health plans' contracts, including the requirement to collect co-pays and deductibles.

28.     Sober homes, conversely, typically do not provide medical care or clinical services to their residents, but operate solely as group residences where residents can live with a support network of others in recovery. Since sober homes are merely places to live, they generate income to cover expenses through the collection of weekly or monthly rent paid by their residents, just as with any other landlord-tenant relationship. Even though a sober home is supposed to be merely a place to live, in recent years, some sober homes have seized upon the opportunity to bill insurance

companies and have entered into agreements with medical providers (such as LIGOTTI) who purport to offer primary care to residents. Those providers may also authorize testing to be conducted at the sober home, or billed by laboratories for such sober home patients.

29.     The Florida Department of Children and Families ("DCF") is responsible for licensure and oversight of addiction treatment facilities that provide Detox, PHP, IOP, and OP programs in the State of Florida. One of the requirements that DCF places on these facilities is that they have a medical director.

## Federal Guidelines for Substance Abuse Treatment

30.     The U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Center for Substance Abuse Treatment ("SAMHSA"), also promulgated guidelines for substance abuse treatment. Those guidelines referred to varying levels of treatment provided based on the severity of the addiction, including, for purposes of this Affidavit, Intensive Outpatient Programs ("IOP").

31.     The American Society of Addiction Medicine ("ASAM") is a professional medical society representing over 6,000 physicians, clinicians and associated professionals in the field of addiction medicine. ASAM published the ASAM Criteria, which was a collection of objective guidelines that give clinicians a way to standardize treatment planning and where patients are placed in treatment, as well as how to provide continuing, integrated care and ongoing service planning, including for Detox, PHP, IOP, and OP treatment services.

32.     According to both ASAM and SAMHSA's guidelines, IOPs were formal substance abuse treatment programs that adhered to a set of formal guidelines. IOPs had to be overseen by a qualified professional. Clients had to receive a thorough evaluation to determine the stage and severity of their illness, including medical and mental disorders. Qualified medical personnel were

to assign clients to a formal treatment plan. The IOP was accountable for the treatment or referral of the client to additional services as necessary. The IOP was obligated to maintain contact with the client until recovery was completed. ASAM and SAMHSA's guidelines recommended that IOPs provide at least nine hours of treatment per week, typically in three, 3-hour sessions. Clients at IOPs also were supposed to attend at least one 30-60 minute individual counseling session per week.

33.     One form of treatment for substance abuse involves the use of a prescription controlled opioid, buprenorphine, in order to wean addicts off of illegal opioids, including heroin. Brand names of these medications include Suboxone and Zubsolv (which also contain naloxone) and Subutex. Only licensed physicians can prescribe these medications. Because drugs containing buprenorphine are Schedule III controlled substances, meaning that there is a strong potential for abuse, resulting in fatal and non-fatal overdoses, prescribing physicians also must have two registrations with the U.S. Drug Enforcement Administration ("DEA"). The first registration is the standard "DEA number," required to prescribe any controlled substance. The second registration is a "DEA X-number," which is granted to a limited number of physicians with valid "DEA numbers," who have completed a training program on substance abuse treatment and have fulfilled other regulatory requirements.

34.     In 2000, Congress passed the Drug Addiction Treatment Act ("DATA"), which amended the Controlled Substances Act to permit physicians to treat opioid addiction using schedules III-V, FDA-approved narcotic drug products without having to obtain a separate DEA registration as a narcotic treatment program. Those registered with the DEA as DATA-waived physicians could treat 30 or 100 patients at any one time. In 2016, Congress passed the Comprehensive Addiction and Recovery Act ("CARA"), which amended the Controlled

Substances Act to permit nurse practitioners and physician assistants registered with the DEA to also treat opioid addiction based on state authority. In 2016, the Department of Health and Human Services published a Federal Register Notice which increased the patient limitation to 275 for physicians.

35.     LIGOTTI was assigned DEA Registration Number BL8491134 on or about September 12, 2003. On or about September 20, 2006, LIGOTTI obtained his Practitioner-DW/30, a designation by the DEA that allowed LIGOTTI to treat up to 30 opioid addicted patients using schedules III-V FDA-approved narcotics, such as buprenorphine, without having to obtain a separate DEA registration as a narcotic treatment program. On or about November 12, 2013, LIGOTTI obtained his Practitioner-DW/100, allowing him to treat up to 100 opioid addicted patients with approved narcotics as described above, and on or about September 20, 2016, he obtained his Practitioner-DW/275, allowing him to treat up to 275 opioid addicted patients with approved narcotics. LIGOTTI's Practitioner-DW/275 registration expires on or about March 31, 2021.

**Payment for Substance Abuse Treatment**

36.     The Patient Protection and Affordable Care Act of 2010 ("ACA"), Pub. L. 111-148, and other federal laws expanded the availability of private insurance to pay for substance abuse treatment in several ways. First, the ACA allowed parents to maintain health insurance for their children through their own insurance policies until the children reached the age of 26. Second, federal law mandated that substance abuse treatment and other mental health treatment must be covered and reimbursed by insurance policies in the manner and at the same levels as other medical treatment. Third, the ACA required insurance companies to cover individuals regardless of prior existing conditions. Fourth, annual and lifetime caps on coverage were removed. Fifth, the ACA

created insurance exchanges that allowed uninsured individuals to apply for and obtain coverage from private insurers. The combination of these provisions created insurance coverage for patients and substance abuse treatment that had previously been excluded from coverage.

37.     These federal laws created access to coverage through a number of avenues, including health plans sponsored by private employers, federal health care benefits programs, and health plans offered directly by private insurance companies. Private insurance companies administer health plans sponsored by private employers and governmental employers. Health plans sponsored by private employers are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, while those sponsored by governmental employers and certain others are exempted from ERISA's jurisdiction.

38.     The National Railroad Passenger Corporation, doing business as Amtrak ("Amtrak") was a private, for profit, Government Corporation, that operated a nationwide system of passenger rail transportation. As part of its employee benefits package, Amtrak established employee health and welfare benefit plans to provide healthcare to their employees, including their spouses, domestic partners and dependent children (collectively, "dependents").

39.     The Federal Employees Health Benefits Program ("FEHBP") provides federal health care benefits to federal employees and their dependents. The United States Office of Personnel Management ("OPM") managed the FEHBP and contracted with various insurance companies to offer these benefits. FEHBP reimbursed the various insurance companies it contracted with for the money the insurance companies paid out for medical benefits, items and services for federal employees. BlueCross/BlueShield ("BCBS") was one of the various insurance companies contracted by the Office of Personnel Management to offer medical benefits, items and services to federal employees under the FEHBP.

40.     Both ERISA and non-ERISA health benefit plans were offered or administered by private insurance companies, including Blue Cross/Blue Shield, Aetna, Humana, Cigna Behavioral Health, Cigna Health & Life Insurance Company, United Behavioral Health, and United Health Group.

41.     All of these health benefit plans were "health care benefit programs," as defined in 18 U.S.C. § 24(b), that is, public or private plans or contracts "affecting commerce, under which any medical benefit, item or service is provided to any individual."

42.     Under state and federal law, all of these health benefit plans were only responsible for claims for services that: (a) were "medically necessary," (b) were provided by a properly licensed service provider, and (c) complied with the terms of the health care plan, including the obligation to pay co-insurance and deductibles.

43.     Bodily fluid testing, which involves conducting tests on a patient's urine, blood, and saliva, can be used to detect recent drug or alcohol abuse by a substance abuse treatment patient. Urine Analysis or urinalysis ("UA") testing is used to detect recent drug or alcohol use.

44.     Substance abuse treatment facilities conduct UA testing in order to determine whether a patient has been using any drugs or alcohol. A point of care ("POC") cup can test for as many as 12 different types of drugs. The POC cup can cost less than $5 and provides an immediate result as to whether a sample is positive or negative. In addition to POC testing, drug screen analyzers and liquid chromatography-mass spectrometry ("LCMS") are an enhanced type of UA testing conducted in laboratory settings. Single urine specimens that undergo drug screen analyzers and LCMS testing can be billed to insurance companies in excess of $5,000.

45.     Insurance plans often provide guidance to service providers, including physicians, substance abuse treatment centers, and laboratories, on the type and frequency of testing that will

be reimbursable. This guidance is based on policy statements from ASAM, publications by expert researchers in the area of substance abuse treatment, and policies of federal and state government agencies. For example, BCBS issued guidance on November 15, 2013, stating that, in certain circumstances, drug-screening tests could be used in connection with substance abuse treatment where a patient is suspected of drug misuse and there was a suspicion of continued substance abuse. Drug screening tests were not medically necessary, however, where simultaneous blood and urine testing was occurring or where testing was merely a routine part of a physician's treatment protocol.

46.     In 2014, BCBS provided more specific guidance, stating that, in an outpatient substance abuse treatment setting, weekly POC/screening tests could be medically necessary during the stabilization phase of treatment for a maximum of four weeks. Once patients reached the maintenance phase, such screening would be appropriate only once every 1-3 months, and such tests should be limited to 15 total during a 12-month period. More sophisticated definitive laboratory testing should be used only in specific situations, such as where an unexpected positive test was inadequately explained by the patient or there was a need for quantitative levels to compare with established benchmark, and should be limited to 12 tests in a 12-month period.

47.     BCBS specified that urine drug testing did not meet the definition of medical necessity in the case of: (1) routine qualitative or quantitative urine drug testing (e.g., testing at every visit, without consideration for specific patient risk factors or without consideration for whether quantitative testing was required for clinical decision making); (2) more sophisticated definitive laboratory testing is used instead of or as a routine supplement to ordinary screening/POC testing; (3) simultaneous blood and urine specimen testing; and (4) testing for residential monitoring.

48.     To bill insurance companies for UAs and other bodily fluid testing, substance abuse facilities often submit claims on Form CMS 1450, also known as the Health Insurance Claim Form ("HICF"), to the client's respective insurance company. Before billing for the UAs, providers must first obtain a prescription from the patient's medical doctor, who must deem the UA medically necessary. HICFs contain, among other information, the client's name and biographical information, his or her insurance information, diagnosis, date and place of service, the standardized procedure codes, the number of units provided, the total dollar amount being charged and name and location of the billing company. The procedure code and the unit volume assist in determining the dollar amount at which the client's insurance company will reimburse the provider. Completed HICFs can be printed and mailed to insurance companies or they can be submitted electronically. When the HICF is submitted, the provider certifies that the contents of the HICF are true, correct and complete.

## The Defendant's Involvement in Health Care Fraud

49.     Numerous former patients, employees, and associates working with LIGOTTI have provided information to law enforcement regarding fraudulent activity being conducted by LIGOTTI, together with his staff at Whole Health and others. As outlined below, LIGOTTI (a) entered into quid pro quo agreements with both indicted and unindicted co-conspirators to provide "standing orders" for medically unnecessary tests at sober homes and addiction treatment facilities as their purported Medical Director, and in return these treatment facilities brought their patients to Whole Health, and LIGOTTI was allowed to bill for patients from these facilities for false and fraudulent treatments and testing at Whole Health; (b) engaged in wide ranging insurance billing fraud, including billing for services not rendered, and billing for medically unnecessary services; (c) billed for medically unnecessary UA and blood tests simply to generate revenue without

15

utilizing the test results in patients' treatment; (d) billed for therapy services that neither he nor his staff were qualified to provide, and which never occurred; and (e) unlawfully dispensed and distributed buprenorphine, a DEA Schedule III opioid that has a strong potential for abuse.

### LIGOTTI's Quid Pro Quo Schemes

50.     A "quid pro quo" scheme is a scheme in which one party does a favor in exchange for a return favor from another party. LIGOTTI employed a quid pro quo scheme whereby he would, as purported Medical Director, provide owners and operators of sober homes and addiction treatment centers with standing orders that authorized laboratory testing for patients at their facilities, without regard to medical necessity, in exchange for a nominal salary and a valuable in-kind benefit: access to a stable of insured addiction treatment patients from those sober homes and treatment centers. The addiction treatment center and sober home owners benefited by virtue of their ability to bill and get paid by private insurers for such tests authorized by LIGOTTI. The testing laboratories benefitted by being able to bill and get paid by private insurers for the medically unnecessary testing authorized by LIGOTTI as the purported Medical Director for these sober homes and treatment centers. LIGOTTI benefitted by being able to bill the patients' insurance companies for additional expensive, medically unnecessary tests, including UAs and blood tests.

51.     In addition, the entire referral network made possible by LIGOTTI authorizing such false and fraudulent testing for these addiction treatment centers, sober homes, and testing laboratories by his signing of standing orders often facilitated kickback relationships between these parties and individual recruiters or brokers for these entities, as the sober home and treatment center owners (through these brokers) received kickbacks from the owners and operators of the laboratories in return for sending specimens their way for testing.

52.     The primary money maker for LIGOTTI and Whole Health was a scheme that involved billing insurance companies for medical services and lab tests purportedly performed by Whole Health staff. He billed his patients' insurance plans exorbitant amounts for excessive and medically unnecessary services that often included thousands of dollars for blood and urine tests, which could range from approximately $1,800 to more than $26,000, and approximately $350 for a single office visit. By way of example, for one patient's single office visit on or around March 24, 2015, Whole Health billed Aetna $25,900 in tests, with an additional $480 for purported therapy and $350 for an outpatient visit fee. Based on billing data that law enforcement has received and recent reports from patients, there is reason to believe that this pattern of excessive billing continues to this day.

53.     LIGOTTI ensured a steady supply of insured patients at Whole Health by establishing agreements with sober home owners and addiction treatment facility owners (collectively referred to as "owners") operating in South Florida. LIGOTTI incentivized these owners to steer insured patients to Whole Health in two primary ways. First, LIGOTTI greatly reduced or completely waived monthly medical director fees he charged to owners to act as their purported Medical Director. Second (which had the potential to be much more lucrative to the owners), he signed standing orders medically authorizing laboratories to conduct regular definitive drug testing for all patients at these owners' sober homes or facilities.

54.     According to several witnesses, including Cooperating Defendant 1 ("CD1"), Cooperating Defendant 4 ("CD4"), and Cooperating Defendant 5 ("CD5"),[2] as described below,

---

[2] The various CDs (cooperating defendants) discussed herein are all cooperating in the hope of receiving a sentencing benefit, or, in the case of those cooperating defendants who have not yet been convicted, a favorable plea agreement or charging benefit. Information provided by the cooperating defendants has been independently corroborated by law enforcement, and thus there is reason to believe that the information provided by the cooperating defendants is truthful, credible, and reliable.

LIGOTTI routinely created and provided standing orders for UAs to testing laboratories, sober homes, and addiction treatment centers. These facilities used these standing orders to order UAs from clinical laboratories under LIGOTTI's authorization, which stated the tests were medically necessary, and then these clinical laboratories and/or these facilities billed private insurance companies for the tests. None of these tests could be billed to patients' insurance companies without LIGOTTI's authorization. Rather than selecting individual UA testing schedules based upon a patient's drug use history, period of sobriety, or any other individualized evaluation, LIGOTTI simply signed these standing orders that authorized testing wholesale and without regard to medical necessity, and he did so in the same manner consistently for the vast majority of the patients purportedly under his care. Based on the patterns seen in this investigation, there is reason to believe that LIGOTTI often signed such standing orders without first seeing or evaluating the patients.

55.     The standing orders signed by LIGOTTI, which were provided to the FBI by Whole Health pursuant to a subpoena for records, often included language affirming that the tests LIGOTTI authorized were medically necessary, that LIGOTTI understood that he would be provided the results for tests he ordered, and that he would review these test results as the authorizing physician. Patient files obtained from Whole Health show that LIGOTTI did in fact receive at least some of these laboratory test results.

56.     For example, on or about August 8, 2016, LIGOTTI signed a standing order for Laboratory 9, which contained the attestation that he understood that "[e]ach laboratory test ordered must be appropriate and necessary for the patient's personal set of clinical circumstances," and that LIGOTTI would "review the laboratory test results."

57.     According to CD1, who pled guilty to conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, and received a ten-year prison sentence, he/she and LIGOTTI had a "wink-wink" relationship. CD1 owned and operated a sober home and an addiction treatment facility. As part of the relationship, LIGOTTI would sign a standing order for CD1 and CD1 would send his/her patients to LIGOTTI's office, where LIGOTTI would bill their insurance for additional testing and services. On one occasion, an insurance company accidentally mailed CD1 an $8,000 or a $9,000 check for a patient's blood test that was supposed to go to LIGOTTI. CD1 did not witness LIGOTTI sign the standing order in person. However, he/she knew LIGOTTI signed it because if LIGOTTI had not, CD1 would never have sent his/her patients to LIGOTTI. CD1 described LIGOTTI's business model as "giving away his prescription pad."

58.     A review of the insurance claims CD1's sober home submitted to BCBS revealed approximately $2,453,400 billed for urine drug tests ordered by LIGOTTI from on or around April 19, 2012 to on or around July 21, 2013. BCBS reimbursed CD1's sober home approximately $647,456 for these tests. According to CD1, LIGOTTI could not see every patient and could not review every urine drug test result. LIGOTTI never spoke to CD1 about the patients' urine drug test results. Based on my training and experience, and facts gathered during this investigation, CD1 could never have received any money from BCBS for urine drug testing without LIGOTTI's approval.

59.     According to CD1, he/she was not initially paying LIGOTTI to act as the Medical Director of his/her treatment facility. However, at some point, LIGOTTI came to CD1 and said, "I can't do this anymore unless you pay me." CD1 explained that if there wasn't a payment made to LIGOTTI to be Medical Director, their arrangement looked like "horse trading" and a kickback arrangement.

60.     Cooperating Defendant 2 ("CD2"), who was arrested at the state level for patient brokering and who ultimately served federal prison time as a result of violating the conditions of his/her federal supervised release, operated three addiction treatment facilities and hired LIGOTTI to act as Medical Director at one of them. LIGOTTI offered to act as CD2's Medical Director for $500 per month. As part of the agreement, however, LIGOTTI stipulated that LIGOTTI would keep the right to bill for blood testing of CD2's patients.

61.     LIGOTTI sent a nurse practitioner and a phlebotomist to CD2's facility to see patients, to draw blood, and to prescribe medications such as Suboxone (a Schedule III controlled substance) and Klonopin (a brand name for clonazepam, a Schedule IV controlled substance). CD2 did not bill insurance for any of the services provided by LIGOTTI's staff. CD2 believed LIGOTTI was billing for these services, and that was the reason LIGOTTI only charged $500 per month to act as Medical Director.

62.     At some point, LIGOTTI recommended that CD2 use Laboratory 1 to test the specimens of CD2's patients. After this recommendation, CD2 began sending specimens to Laboratory 1. CD2 set up a shell company to receive kickback payments from laboratories for urine drug tests ordered by LIGOTTI. On or about June 21, 2016, LIGOTTI signed a "Protocol Set-Up" form, also known as a standing order, authorizing Laboratory 1 to test the specimens originating from CD2's shell company. The "Protocol Set-Up" was provided to the FBI by LIGOTTI's criminal defense attorney in response to a subpoena for records from Whole Health.

63.     In addition to the "Protocol Set-Up" form described above, Whole Health turned over an additional 136 standing orders through which LIGOTTI authorized laboratory testing for numerous addiction treatment facilities and sober homes. Based on my experience working addiction treatment fraud and laboratory testing fraud cases, I know that these standing orders are

20

incredibly valuable to sober home and addiction treatment facility owners. By signing these standing orders, LIGOTTI enabled the owners to routinely test their residents or patients for urine drug tests that could be billed to insurance companies in excess of $5,000 per test, without regard to medical necessity or the individual patients' needs. Many of the owners had illegal kickback arrangements with the laboratories that could not have occurred without LIGOTTI's medical authorization to conduct these tests. LIGOTTI understood that his signature on these standing orders ensured the owners would continue to steer their patients to Whole Health, allowing LIGOTTI a continuous stream of patients that he could bill for excessive and medically unnecessary services.

64.     The laboratories utilized through these standing orders often included laboratories thousands of miles away and rural hospitals that did not have the capability to perform these tests adequately and in a timely fashion that would assist in guiding patient care.

### Billing Fraud and Related Kickback Schemes

65.     Health care fraud kickbacks are arrangements made between parties in which one party refers patients to another through services, goods, or medicines, and the receiving party receives remuneration for that referral. As described further below, LIGOTTI's actions facilitated a web of kickbacks between owners and operators of laboratories, sober homes, and addiction treatment centers.

66.     TARGET 1, LIGOTTI's business partner and close friend, acted as a laboratory broker, also commonly referred to as a "lab rep," for LIGOTTI. TARGET 1, who was interviewed by the FBI in March 2019, referred to himself as a "matchmaker" in that he would find owners and operators of urine drug testing laboratories and introduce them to LIGOTTI. TARGET 1 acted

as a lab rep for four different laboratories used by LIGOTTI. These four laboratories will herein be referred to as Laboratories 2 through 5.

67.     TARGET 1 admitted to the FBI that he was receiving payments from the laboratories he matched up with LIGOTTI. A review of TARGET 1's bank records corroborated that his corporate Wells Fargo bank account received approximately $1,629,154 in deposits from Laboratories 2 through 5. From on or about December 4, 2015 to on or about February 15, 2017, Laboratory 2 paid TARGET 1 approximately $686,120; from on or about June 9, 2016 to on or about March 7, 2017, Laboratory 3 paid TARGET 1 approximately $718,284; from on or about April 7, 2017 to on or about June 19, 2017, Laboratory 4 paid TARGET 1 approximately $89,000; and from on or about April 16, 2017 to on or about January 23, 2018, Laboratory 5 paid TARGET 1 approximately $135,750.

68.     According to TARGET 1, LIGOTTI never asked what Laboratory 2 was paying TARGET 1. TARGET 1 recalled that he may have said to LIGOTTI something along the lines of, "Oh my god, I got a check for $10,000" but, according to TARGET 1, LIGOTTI would have responded by saying he preferred not to hear that. LIGOTTI would tell TARGET 1 he was happy for TARGET 1 and hoped he was wildly successful. LIGOTTI told TARGET 1 he did not need people thinking TARGET 1 was giving LIGOTTI anything. According to TARGET 1, LIGOTTI did not want it to even "sniff" as if the two were making money from the labs. LIGOTTI once told TARGET 1 that he should not rely solely on the lab income.

69.     When interviewed, TARGET 1 agreed that the money he received from Laboratories 2 through 5 would not have happened without LIGOTTI's signature on, and approval of, standing orders.

70.     A further review of TARGET 1's bank records shows that TARGET 1 took approximately $938,850 of the approximately $1,629,154 he received from Laboratories 2 through 5 and invested that money into ARROW PASSAGE RECOVERY ("APR"). APR is a treatment center operating out of Massillon, Ohio, which is co-owned by TARGET 1, LIGOTTI, and LIGOTTI's wife. When interviewed, TARGET 1 confirmed that he and LIGOTTI are 50/50 owners of APR. Based on the foregoing, as well as my experience and training, there is reason to believe that LIGOTTI benefitted from the illegal laboratory kickbacks paid to TARGET 1 through TARGET 1's $938,850 investment into APR.[3]

71.     CD1, who pled guilty to conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, and received a ten-year prison sentence (as described in paragraph 57), admitted that his/her sober home and addiction treatment center would offer patients free room and board and airline tickets to entice patients to come to his/her facilities. Once there, per CD 1, patients could be billed for UA testing thanks to LIGOTTI's standing orders.

72.      Cooperating Defendant 3 ("CD3"), who pled guilty to patient brokering at the state level and was sentenced to one year in prison, also acted as a laboratory broker for LIGOTTI. CD3 was interviewed by the FBI in December 2019. He/she described TARGET 1 as a "lab rep" and "a competitor of mine." CD3 would see TARGET 1 at Whole Health when CD3 was there to pick up urine and blood specimens. CD3 recalled that "there was a pile for him and a pile for me." CD3 estimated visiting Whole Health one to two times per week to pick up the specimen boxes.

73.     CD3 had an arrangement with Laboratory 6 ("Laboratory 6") where he/she would receive illegal kickbacks in exchange for the urine and blood of insured patients. Prior to accepting

---

[3] During TARGET 1's interview, TARGET 1 said he and LIGOTTI sat down with Law Firm 1, a healthcare law firm, to ask if they could go forward with the financial relationship at APR without getting in trouble. According to TARGET 1, the attorneys said yes, and gave their approval to TARGET 1 and LIGOTTI in writing.

specimens from new accounts such as sober homes or treatment facilities, Laboratory 6 required that a doctor complete onboarding paperwork. When signing up a new account, CD3 would take the onboarding paperwork to LIGOTTI's office for his signature and would later provide the completed paperwork to Laboratory 6. After this occurred, CD3's new accounts could begin sending specimens to Laboratory 6. A review of Laboratory 6's bank records show that Laboratory 6 paid CD3 approximately $3,328,799. CD3 estimated that between 80 and 90% of the specimens he/she sent to Laboratory 6 were ordered by LIGOTTI.

74. CD3 believed LIGOTTI liked him/her because he/she brought LIGOTTI a lot of business. LIGOTTI never asked CD3 for money in exchange for the urine and blood he was providing to CD3; instead, LIGOTTI asked CD3 to "let people know what you think of me." CD3 would recommend LIGOTTI to sober home owners whose residents did not already have a medical doctor. LIGOTTI was aware of the patients CD3 was responsible for referring to Whole Health because Whole Health's patient intake forms listed the name of each patient's sober home, and LIGOTTI knew which sober homes had been referred by CD3. Additionally, the onboarding paperwork from Laboratory 6 that LIGOTTI signed listed CD3's name on it.

75. LIGOTTI had the capability to complete blood and urine tests in-house at Whole Health. CD3 knew that LIGOTTI was out-of-network with insurance companies, and believed LIGOTTI offered up these otherwise billable specimens to CD3 and to TARGET 1 for two reasons: first, because LIGOTTI knew insurance companies would not reimburse Whole Health for the specimens of certain insured patients, so he gave them to CD3, whose laboratory (Laboratory 6) had better insurance contracts that would likely be reimbursed; and second, LIGOTTI wanted to "incentivize" CD3 and TARGET 1 to keep sending new patients to Whole Health. CD3 referred to this practice as LIGOTTI "keeping some meat on the bone."

76.     CD3 confirmed that Laboratory 6 would not have paid him/her any of the $3,328,799 were it not for LIGOTTI. CD3 said that if LIGOTTI had not signed off on the lab tests he/she would have tried to have found another doctor.

77.     CD4, who was charged with patient brokering at the state level and has not yet been convicted or sentenced, was another laboratory broker who worked with LIGOTTI. CD4 was interviewed by the FBI in June 2020. CD4 worked as a broker for Laboratory 7 ("Laboratory 7"). CD4 estimated he/she had a minimum of 12 accounts with LIGOTTI, and during the summer and fall of 2016, LIGOTTI was the provider on every sober home account CD4 had.

78.     CD4 estimated meeting in person with LIGOTTI five times. During one meeting, LIGOTTI told CD4 he had an "informal agreement" wherein the treatment center would send LIGOTTI their blood and LIGOTTI would serve as their Medical Director at a low fee.

79.     CD4 also had frequent interactions with TARGET 2. CD4 would drop off "sign up" forms from his/her lab for LIGOTTI to sign. CD4 met with TARGET 2 two to three times at first before meeting with LIGOTTI, with each meeting being tied to a new account. Once CD4 had more of a presence, LIGOTTI invited CD4 back to his office for a meeting. TARGET 2 would sign LIGOTTI's name on laboratory requisition forms, which CD4 questioned. When CD4 asked TARGET 2, "Are you sure you can do that?" TARGET 2 told CD4 that "it's fine, it's the same thing as a signature stamp." CD4 never saw LIGOTTI sign anything. The laboratory requisition forms were given and left with TARGET 2, and CD4 would return and get them later. CD4 saw TARGET 2 sign the forms on one occasion, and TARGET 2 signed about 15 of them.

80.     CD4 described the process related to his/her sober home accounts and LIGOTTI as follows: CD4 promised money to a sober home owner who had patient urine but did not yet have a laboratory or an approving physician. CD4 would go to LIGOTTI and have him sign Laboratory

7's standing order. Laboratory 7 would then send supplies to the sober home to facilitate urine collection. Once collected, urine would be sent from the sober home to Laboratory 7 for testing. After the test, Laboratory 7 would bill the respective patient's insurance company, and the insurance company would ultimately reimburse Laboratory 7. Laboratory 7 billed insurance companies approximately $5,500 per test three times per week. After receiving reimbursement, Laboratory 7 would then pay CD4 via wire, which was usually between $200-300 per specimen. CD4 would then pay the sober home owners $150-200 per specimen. CD4 paid "bogus" account reps, meaning friends or relatives of the sober home owner, or he would pay the sober home owner directly.

81.   According to CD4, sober home owners would always take their patients to LIGOTTI. CD4 would only pay the sober home owners if they sent their patients to LIGOTTI.

82.   Laboratory 7's test results were sent into an electronic portal. CD4 knew LIGOTTI never reviewed these test results because LIGOTTI's office never asked for login information to access the provider portal.

### LIGOTTI's Additional Billing Fraud Schemes

83.   Health care billing fraud schemes often involve billing for services not rendered, billing for medically unnecessary tests, or "upcoding," which involve billing for a higher and more expensive standard of care than was actually rendered. LIGOTTI's billing fraud included billing for excessive and duplicative testing as well as billing for services not rendered by LIGOTTI.

84.   LIGOTTI liberally signed standing orders for laboratory brokers and sober home owners, authorizing medically unnecessary tests, as an incentive to ensure they supplied a steady stream of insured patients to Whole Health (as described above in paragraphs 50-80). Additionally, once at Whole Health, LIGOTTI billed the patients' insurance plans exorbitant amounts for

excessive and medically unnecessary services. Based on billing data that law enforcement has received and recent reports from patients, there is reason to believe that this pattern of excessive billing continues to this day.

85.     For example, an analysis of private insurers billing records for Whole Health has revealed that LIGOTTI billed a Blue Cross Blue Shield Patient (T.M.) more than $485,000 for services from on or about August 1, 2013 through on or about July 1, 2019; a BCBS patient (K.P.) more than $707,000 from on or about January 1, 2013 through November 30, 2016; an Aetna patient (O.B.) over $591,000 from on or about May 23, 2014 through on or about April 5, 2018; and an Aetna and Cigna patient (J.S.) more than $840,000 from on or about November 26, 2013 through on or about February 27, 2020.

### BCBS and United Healthcare Identified LIGOTTI Billing Fraud Schemes

86.     LIGOTTI has been under investigation and pre-payment review by at least two private insurance companies since at least 2014. Specifically, United Healthcare ("UHC") flagged LIGOTTI for pre-payment review beginning on or around January 2014, and all of Whole Health has been under review since in or around February 2017 for all billing codes. Blue Cross Blue Shield has also placed LIGOTTI and Whole Health under pre-payment review since on or before January 13, 2017.

87.     Additionally, LIGOTTI and Whole Health filed a civil suit in 2016 alleging that UHC withheld payments in violation of ERISA. *Ligotti v. United Healthcare Servs., Inc.*, No. 16-60558-cv-RKA (S.D. Fla. Mar. 17, 2016). In LIGOTTI's Complaint, which has been amended three times, he admits knowledge of UHC's Special Investigation Unit ("SIU") flagging his account as early as January 2014, and that the investigations related to misrepresentations and being involved in "quid pro quo" schemes. Indeed, LIGOTTI's Third Amended Complaint in the

UHC matter states that UHC attempted to "improperly condition payment" of LIGOTTI's claims on his agreement to assist in UHC's investigations against treatment facilities and sober living homes that were also engaging in fraudulent billing.

88.     LIGOTTI continued his practice of "misrepresenting his services" (billing fraud) and engaging in quid pro quo schemes with treatment facilities and sober home well after he was made aware by private insurers that those practices were not acceptable.

### Patients of Whole Health Who Identified Billing Fraud Schemes

89.     LIGOTTI billed the BCBS insurance policy of Confidential Witness 1 ("CW1") approximately $485,365 and received approximately $151,745 for services provided between on or about August 1, 2013 and on or about July 1, 2019. CW1, who last saw LIGOTTI as recently as in or around July 2020, first learned of LIGOTTI in or around 2013 while living in a sober home in Fort Lauderdale. The residents of the sober home were all required by the sober home owner to get into a van and drive to Delray Beach to see LIGOTTI. CW1 thought this was unusual given that LIGOTTI's office was an hour away.

90.     In or around October 2018, CW1 was living at a different sober home in Boynton Beach. While there, he/she attended Treatment Facility 1. Treatment Facility 1 required all their patients to go to LIGOTTI's office and transported them to LIGOTTI's office once a week in a van. CW1 did not know why the treatment facility required the patients to go see LIGOTTI, and he/she heard one patient in LIGOTTI's office saying, "I don't know why I am here." CW1 described his/her trips to LIGOTTI's office in the van as being "miserable." He/she estimated spending two hours at the office during these trips because he/she had to wait for all the patients to finish their visits before the van left.

91.     Treatment Facility 1 conducted urine drug tests two to three days per week. Additionally, LIGOTTI's office conducted a urine drug test for each patient who visited his office. CW1 would have thought Treatment Facility 1 and LIGOTTI would have shared the drug test results with each other, but CW1 saw no evidence that LIGOTTI's staff was aware of the results of the tests she took at Treatment Facility 1 and vice versa.

92.     Upon entering Whole Health for a visit CW1 signed in and went into a bathroom to collect a urine sample, which was required. Prior to going into the bathroom, a "buff" security guard gave him/her an empty cup and required him/her to place his/her belongings into a lockbox. CW1 then went into the bathroom, and provided the sample, unsupervised. No one from LIGOTTI's office ever went over CW1's urine or blood test results with him/her, except for a couple occasions when he/she tested positive for drugs. For a period of time, he/she was actively using drugs while attending LIGOTTI's office. During this time, he/she remembered a LIGOTTI staff-member told him/her he/she tested positive for cocaine or morphine. Regardless, CW1 still left the office with a prescription for buprenorphine. According to CW1, this showed that the test results did not matter.

93.     CW1 indicated that he/she harbored suspicions about LIGOTTI because LIGOTTI and his staff always pressured him/her into providing blood samples. Regardless, he/she continued to see LIGOTTI as recently as in or around July 2020 to obtain refills on his/her prescriptions for Zubsolv, a buprenorphine product. According to CW1, LIGOTTI's office took CW1's blood whenever they wanted. CW1 would argue and say, "I don't know why my blood is being taken. It has already been taken." LIGOTTI's staff would tell CW1 that he/she had to continue to provide it because the tests were "routine." CW1 tried to talk LIGOTTI's office out of taking his/her blood,

29

but they have pushed back and told him/her it was routine. After visits to LIGOTTI's office, CW1 would tell his/her dad, "They took my blood again today."

94.     Although CW1 only visited LIGOTTI's office to receive refills on his/her prescriptions, he/she felt LIGOTTI used his/her medical history simply to justify doing additional tests on him/her. LIGOTTI's staff talked him/her into having an ultrasound, even though he/she kept telling them he/she had already had an ultrasound done by his/her OBGYN. CW1 allowed LIGOTTI's office to do the ultrasound "just to get them to shut up."

95.     Even though CW1 never underwent therapy sessions while at LIGOTTI's office, Whole Health billed his/her insurance for 30-minute therapy sessions that purportedly occurred during 18 different office visits between on or about May 18, 2016 and on or about September 20, 2017. The billed amount on these claims totaled approximately $3,300, and BCBS reimbursed Whole Health approximately $2,340.

96.     A review of Whole Health's BCBS claims data showed that LIGOTTI billed CW1's insurance approximately $485,665, and was reimbursed approximately $151,745. Claims were submitted for blood and urine tests for over $419,000 between on or about August 1, 2013 and on or about July 1, 2019.

97.     LIGOTTI billed the BCBS insurance policy of Confidential Witness 2 ("CW2") approximately $223,010 and received approximately $2,616 for services provided between on or about June 10, 2014 and on or about December 19, 2018. Similar to CW1, Whole Health billed CW2's insurance for 30-minute therapy sessions that, according to CW2, CW2 never received. Although insurance claims submitted by Whole Health indicated to BCBS that CW2 was diagnosed with hallucinogen dependence, generalized anxiety disorder, and myalgia, CW2 never had any of these diagnoses. CW2 only saw LIGOTTI to obtain Suboxone refills. He/she had urine

drawn regularly but LIGOTTI never reviewed the results with him/her, except for possibly during his/her first visit. After one visit when CW2 had his/her blood drawn, he/she received an "outrageous bill" in the mail from an unknown laboratory. CW2 and his/her mother went to LIGOTTI's office to complain and afterward never again heard from the laboratory again.

98.     Confidential Witness 3 ("CW3"), who was interviewed by the FBI in September 2016, attended LIGOTTI's office as a patient approximately once per month, but sometimes more frequently. While there, LIGOTTI drew blood on two or three occasions, but CW3 indicated there was more blood work billed to his/her insurance than was actually done. LIGOTTI would look patients "up and down" and look for something wrong. CW3 felt like LIGOTTI was trying to find something to bill and that the treatments were not medically necessary. CW3 would provide urine samples at LIGOTTI's office, which he/she thought was odd because he/she was also providing his/her urine at Treatment Facility 2 ("TM2") three to four times per week.

### Employees of Whole Health Who Identified Billing Fraud Schemes

99.     In addition to LIGOTTI's patients identifying fraudulent billing practices occurring at LIGOTTI's office, former employees identified similar conduct as well.

100.    Confidential Witness 4 ("CW4"), who was interviewed by the FBI in January 2017, worked at Whole Health as a nurse practitioner ("NP") from in or around July 2016 to in or around November 2016.

101.    CW4 typically saw 25 to 40 patients per day at Whole Health, while the practice saw more than 100 patients per day. According to CW4, LIGOTTI was adamant that every patient submit urine during every visit. CW4 further stated that LIGOTTI would get angry with employees who forgot to collect urine and yelled at them to fill cups with toilet water if they had to. The cups that patients urinated into were unmarked and not monitored. One of LIGOTTI's lab employees

would not label the specimens, which led to specimens whose originator could not be determined. Before October 2016, all drug screens were signed off by LIGOTTI. However, sometime after October 2016, LIGOTTI started putting other nurse practitioners' names on the drug screens.

102.   According to CW4, TARGET 2 asked CW4 for his/her NPI number because TARGET 2 wanted to put CW4's name on urine drug screens. CW4 had knowledge that his/her signature was forged for some urine drug screens. In October 2016, TARGET 2 asked CW4 to write prescriptions for drugs that patients did not need. TARGET 2 demanded that patients get prescriptions even though they had not been seen by a medical professional.

103.   CW4 further stated that LIGOTTI sent some specimens to external laboratories and used a color-system to organize which specimens went to which labs. For example, specimens highlighted in yellow were designated for one lab, specimens highlighted in pink were designated for the wife of CD3's lab, specimens highlighted in another color were designated for Laboratory 8 ("Laboratory 8"), and specimens tested in-house were highlighted in a yet another color. LIGOTTI told CW4 he/she needed to figure which laboratories to send patients' blood to, a decision that was based on insurance reimbursements.

104.   CW4 also indicated that LIGOTTI had a series of panels that LIGOTTI used to test patients' blood called the "recovery panel." The recovery panel was run on patients when they started, then every three months or if the patient relapsed. Compensation for blood tests done by Whole Health could range between approximately $19,000 and approximately $26,000 per patient.

105.   Confidential Witness 5 ("CW5"), who was interviewed by the FBI in June 2017, worked at Whole Health as a nurse practitioner ("NP") from in or around May 2016 to in or around December 2016. Similar to CW4, CW5 stated LIGOTTI pressured CW5 to get urine samples from patients. The requirement for a urine sample did not matter what the person was seeing the doctor

for. According to CW5, LIGOTTI said, "even if you have to scoop urine out of the toilet, you have to do it." CW5 was also pushed to get blood from patients, which he/she believed was unnecessary if blood had already been taken.

106.    CW5 learned that at some point, LIGOTTI began putting his/her name and the name of two other Whole Health NPs on laboratory documents. CW5 also learned that his/her name was being forged on laboratory requisition forms, which CW5 understood was done at LIGOTTI's direction.

107.    The NPs at Whole Health were not allowed to see the patient charts after LIGOTTI saw them. CW5 was aware that LIGOTTI "checked off" a diagnosis code in a chart of a patient he did not see, a practice CW5 described as "upcoding." CW5 saw the chart and what LIGOTTI had done and challenged him, but LIGOTTI gave him/her a nonsensical answer.

108.    Confidential Witness 6 ("CW6"), who was interviewed by the FBI in January 2020, worked at Whole Health as a nurse practitioner from the late summer of 2015 to the spring of 2016.

109.    He/she described Whole Health as being busy and he/she estimated seeing between 30 and 45 patients each day. He/she saw addiction treatment patients who were there to be medically cleared before they could begin addiction treatment at an offsite treatment center. These patients were brought into LIGOTTI's office every day in "druggy buggies," which were 15-passenger vans that contained anywhere from 10 to 15 addiction treatment patients. TARGET 2 pushed the staff to see more patients and used to ask them if they knew of any treatment facilities that needed LIGOTTI's office to see them.

110.    CW6 felt that most of the treatment centers that bought patients to LIGOTTI's office were "crooked." The centers popped up quickly and went out of business shortly thereafter; and the owners were often drug dealers. Patients at LIGOTTI's office have talked to CW6 about

getting drugs from the treatment facilities they attended. When reviewing patients' urine drug test results, he/she found patients who tested positive for illicit drugs. When he/she told LIGOTTI about these conversations, and about the patients who tested "dirty," LIGOTTI told CW6, "We don't get involved with those facilities and what they do."

111.    CW6 observed LIGOTTI and TARGET 2 having closed-door meetings with "strange people" a couple of days per week. These individuals were not patients, but CW6 could tell they were in recovery. CW6 believed that most of them were owners of detox facilities, IOPs, and PHPs. The meetings usually lasted between 30 and 40 minutes, and when they were finished, LIGOTTI, TARGET 2, and whoever else they were meeting left appearing happy.

112.    CW6 never observed patients receiving 30-minute psychotherapy sessions at LIGOTTI's office; there were no psychologists or counselors onsite.

113.    Confidential Witness 7 ("CW7"), who was interviewed by the FBI in February 2020, worked at Whole Health as a medical technologist full-time in Whole Health's laboratory. He/she was at Whole Health from 2015 to late 2017 or early 2018.

114.    Whole Health's clientele was primarily made up of drug rehab patients. Whole Health performed lab analyses on urine and blood specimens, and according to CW7, there were a lot of urine and blood tests conducted. Every Whole Health patient provided a urine or blood sample if Whole Health thought it was necessary. No one from Whole Health monitored the patients while they were providing urines samples.

115.    CW7 was very familiar with what a normal urine sample should look like. He/she could tell from a visual analysis if the urine was fake. If the urine was believed to be fake, CW7 would advise LIGOTTI. Sometimes LIGOTTI would make the patient provide another sample, and other times he would tell CW 7 to just run the test anyway. On one occasion, a patient was

supposed to provide a urine sample and provided two cups in which the urine inside clearly looked different. The same patient name was written on both cups but, according to CW7, the urine did not appear to be from the same patient. CW7 told LIGOTTI about the incident and LIGOTTI instructed CW7 to run the test anyway.

116.    Similar to urine drug tests, blood tests were run in-house at Whole Health. The blood tests primarily tested for diseases, not drug abuse. The full recovery blood panel was a very detailed test that LIGOTTI wanted run on drug addiction patients every three months. CW7 felt the blood test was run redundantly. CW7 and another employee who worked in the Whole Health laboratory would complain to each other about running the same tests so often for the patients. They would say, "We just did this," and ask if they needed to test it again. CW7 would sometimes ask herself if it was really necessary to test this extensively every three months, but also understood this clientele group would lie to physicians. On occasion, the tests were ordered more frequently than every three months. In these instances, CW7 would sometimes ask LIGOTTI, "Hey we just did this, how much more will this test do for you?"

117.    CW7 remembered several instances of "bad urine" and "bad blood" draws being produced. Bad blood draws would occur due to a drug abuser being "hemolyzed." This occurred when a drug abuser could only produce small amounts of blood that were insufficient to perform the test. CW7 saw several blood draws that were inadequate and unable to be tested. He/she would tell the physician's assistant or LIGOTTI that these were bad specimens, but Whole Health staff and LIGOTTI would say to just run the test. This happened every once in a while. LIGOTTI and one of his PAs would push back on the issue of bad blood draws. They wanted the test run even when CW7 said the test would not provide any analysis or any benefit to the patient.

118.     CW7 knew some of the tests should not have been run. He/she began writing in the notes section of the Whole Health's computer system, known as the LIM system, "per DR. LIGOTTI" on the tests he/she and the other laboratory employee felt were not a necessity or a bad specimen. Traditionally, CW7 never put notes on the tests. If a test had a note made by CW7, this meant the test was run against his/her advice.

119.     CD5, who was interviewed by the FBI as recently as July 2020, worked at Whole Health as an NP from in or around May 2016 to in or around May 2017. CD5 expects to be charged with federal health care fraud conspiracy charges (18 U.S.C. § 1349) related to his/her conduct with LIGOTTI in the near future, and is cooperating in hopes of a favorable plea agreement or charging benefit.

120.     In addition to working as an NP for LIGOTTI, CD5 would find addiction treatment facilities as new business for LIGOTTI. At LIGOTTI's direction, CD5 would present the facilities with three options for hiring LIGOTTI as a purported Medical Director: (1) the facility would pay $4,000, with $2,000 of that going to CD5 and the other $2,000 going to a psychiatrist hired by CD5 to be the Medical Director; (2) CD5 would find a psychiatrist to be a Medical Director for $2,000, but CD5 would see the patients and LIGOTTI would bill for the patient visits. There would be a paper chart for the patient at LIGOTTI's office and LIGOTTI would send a medical assistant or phlebotomist to the facility; or (3) the facility would pay $500 per month and LIGOTTI would be the Medical Director. CD5 was in several meetings where he/she was told LIGOTTI did not actually bill the facility the $500/month, per their agreement.

121.     CD5 found the fact that LIGOTTI was purportedly Medical Director of facilities that did not pay him to be a problem. CD5 explained that the benefits for LIGOTTI being the Medical Director, without any payment from the facility, were: (1) he could bill all those patient

visits, (2) he had a high-complexity, physician-owned lab ("POL") in his office, which he used to run $17,000 blood tests on those patients, (3) he could run urine tests on those patients, and (4) he could run genetic tests on those patients.

122.    LIGOTTI told CD5 that he would bill for a certain type of lab, then would keep raising the price until he got the maximum an insurance company would pay, then that is what the price for the lab tests would be set at.

123.    CD 5 explained that the sober homes would bring patients every month to LIGOTTI and he would do the lab testing of patients at his own laboratory. The sober homes patients also had lab testing done at the sober homes per LIGOTTI's standing orders.

124.    During CD5's employment with LIGOTTI, NPs were unable to prescribe Suboxone. Some nurse practitioners at Whole Health would just call in prescriptions under LIGOTTI's DEA license number, or just called TARGET 2 directly to fill the prescription. This was happening without LIGOTTI ever seeing the patient. CD5 described TARGET 2 as the "pivot point" for everything that happened in the office. According to CD5, CD5 had the impression that TARGET 2 knew everything that happened in the office.

125.    CD5 never observed any therapy sessions being completed inside of Whole Health, and did not know of any therapists working there.

126.    CD5 also observed a different standard of panels being completed for "scholarshipped" or uninsured patients.[4] LIGOTTI's office would either not complete blood tests,

---

[4] "Scholarshipping" is a term I am familiar with based on my training and experience, which is used by sober home owners and patients to describe individuals who lack health insurance but are nonetheless granted a place to stay in a sober home, and whose treatment is paid for by the facility, based upon their affiliation with insured individuals, such as romantic partners who are also receiving treatment or living at the facility, or patient recruiters.

or test a different panel for uninsured patients to reduce the cost in lab work. If LIGOTTI's office saw the same patient, one was insured and one was not, different panels would be run.

127.    The evidence provided both by Whole Health patients and Whole Health employees shows that LIGOTTI's primary concern was obtaining blood and urine from insured patients. Evidence gathered suggests that LIGOTTI did not collect these specimens so he could utilize the results to guide patient care; he collected these specimens to make money from insurance companies. LIGOTTI's intent to defraud is demonstrated by his instructions to scoop water out of the toilet; or to run urine and blood tests when his staff indicated the results would be worthless because the specimen-provider could not be identified, or because the patient was hemolyzed. Based on my experience, I know that billing fraud schemes alone generally do not harm the patients whose insurance plans who are defrauded. However, LIGOTTI was defrauding an extremely vulnerable patient population already prone to frequent overdoses that can result in death, and he was providing a captive audience of addicted patients with buprenorphine prescriptions to ensure their continued return.

### LIGOTTI's Letter to DCF

128.    On or about September 13, 2013, LIGOTTI drafted a letter to DCF in which he stated in part, "I was astonished and outraged to learn that my name and license may be currently used in an unauthorized fashion by entities involved in the treatment of patients/clients in recovery for drug and alcohol dependence." Despite the substance of the letter, in the nearly seven years since LIGOTTI drafted it, he continued to authorize addiction treatment centers and sober homes to order medically unnecessary urine drug tests through the laboratories, as described above. Thus, there is reason to believe LIGOTTI sent this letter to DCF as a manufactured defense, which

LIGOTTI could point to at a later time as evidence showing he did not know that treatment facilities were using his name and license to order costly urine drug tests.

### LIGOTTI's Unlawful Drug Distribution

129.    Although LIGOTTI was only authorized by the DEA to treat 100 patients with buprenorphine from on or about November 12, 2013 to on or about September 20, 2016 (as previously explained in paragraph 35) he exceeded this amount for 16 consecutive months beginning in or around May 2015. In or around August 2016, his violation of the DEA regulations peaked when he prescribed buprenorphine to 287 unique patients; nearly tripling his allowed number of monthly patients, which was 100.

130.    According to numerous patients interviewed by law enforcement officers assigned to this investigation, Whole Health prescribed buprenorphine to patients regardless of their drug test results. Based on my training and experience, as well as consultation with Dr. Clark, an expert on addiction treatment medicine (described further in paragraph 134), Whole Health's failure to review or factor these drug test results in prescribing buprenorphine was a dangerous practice, especially given the potentially deadly combination of mixing buprenorphine with benzodiazepines (i.e. Xanax, Valium, and Ativan, all Schedule IV controlled substances). Furthermore, CW1 told the FBI that he/she obtained buprenorphine from LIGOTTI's office as recently as July 13, 2020.

131.    LIGOTTI exceeded his 100-patient-limit, and prescribed buprenorphine to drug-addicted individuals whose drug test results would have shown that more buprenorphine was likely to harm them. An analysis of LIGOTTI's prescriptions revealed that 12 patients died while having an active buprenorphine prescription from LIGOTTI. While I do not contend that all of these patients died as a direct result of LIGOTTI's last prescription, the search warrant requested herein

seeks to obtain Whole Health patient files for individuals who died under LIGOTTI's care, which will allow further investigation into LIGOTTI's actions, or inaction, leading up to their deaths, and are likely to contain evidence of crimes including, but not limited to, health care fraud.

132.    Certain patients interviewed by the FBI had knowledge of, or in some cases participated in, diverting the buprenorphine prescribed by LIGOTTI. Buprenorphine has a street value and is a Schedule III opioid because of its potential for abuse. A review of LIGOTTI's prescription drug monitoring program ("PDMP") data[5] showed that over 400 patients received prescriptions for buprenorphine from LIGOTTI filled their prescription at least three days before their prior prescription was set to have run out.

133.    According to addiction treatment experts, medications like buprenorphine which have misuse, diversion, and addiction potential should be used with caution in people who have addictive disease. When these medications are prescribed for people with addiction, it is standard of care to perform diversion control protocols, including drug testing, pill counts, and checking state PDMPs. It runs counter to that standard of care to provide patients with more medication prior to their prior prescription running out, as LIGOTTI did.

**Expert Consultant Findings on Billing and Other Fraud Schemes**

134.    The law enforcement team investigating this matter consulted with an expert in addiction treatment, Dr. Kelly J. Clark. Dr. Clark is a licensed Medical Doctor (M.D.) in Florida (and in ten other states), and also has a Master's in Business Administration (M.B.A.). She has over 20 years of experience in the addiction treatment field; is board-certified in addiction medicine and psychiatry; is a distinguished fellow of the American Psychiatric Association and

---

[5] A PDMP is an electronic database that tracks controlled substance prescriptions in a state. PDMPs can provide health authorities and prescribers up to date information about controlled substance prescription patterns and patient behaviors.

the American Society of Addiction Medicine; has been a Chief Medical Officer for two multi-state addiction treatment companies; and worked on various national guidelines establishing the standards of care for addiction treatment and testing. Since April 2019, Dr. Clark has served as the Immediate Past President of the American Society of Addiction Medicine (and was a former President), and remains on its Board.

135.    Dr. Clark recently provided expert testimony at trial in the Southern District of Florida in two cases regarding allegations of addiction treatment fraud, one of which was against a physician (*United States v. Abovyan*, Case No. 18-80122-CR-MIDDLEBROOKS (physician defendant); *United States v. Ahmed*, Case No. 19-60200-CR-COHN/MORENO) (owner and executive of sober homes and addiction treatment facility). Dr. Clark has been retained as an expert in other addiction treatment fraud cases, and was admitted as an expert witness after a *Daubert* hearing before this Court on June 26, 2019 (*United States v. Snyder*, et al., Case No. 18-80124-CR-ROSENBERG).

136.    Dr. Clark has reviewed a subset of LIGOTTI's patient records and billing claims, and found that the standard protocol for LIGOTTI's office was to use blank laboratory order forms to send UA specimens for expensive laboratory testing. The expert opined this was like using a pre-signed, blank prescription pad—the specifics of the testing were left to others to fill in.

137.    Dr. Clark found that LIGOTTI's UA testing patterns showed evidence of excessive and unnecessary testing done on a routine basis. She found new tests were routinely ordered and done before LIGOTTI received results for prior ones. She also found that patients were not required to provide samples consistent with unadulterated human urine, despite preliminary testing showing the presence of adulterants or that the specimens were watered down. These and other samples were routinely submitted for expensive definitive testing. Based on this consultation, there

is reason to believe that LIGOTTI did not use these UA tests in order to make treatment decisions, but rather as a revenue-generation device. Thus, Dr. Clark's review corroborates the witness testimony and other evidence described herein.

138.    Dr. Clark found that LIGOTTI's standard practice was to bill for blood tests that were not medically necessary nor appropriate, and that these blood tests were not done to treat patients but for revenue generation.

139.    Dr. Clark found that these medically unnecessary UA and blood tests ordered by LIGOTTI represented a pattern, that LIGOTTI was aware of the high amounts that private insurers were billed for these tests, and that this was his standard practice at Whole Health.

140.    Dr. Clark found an additional pattern of billing for services, specifically psychology and psychotherapy services, that LIGOTTI and his staff at Whole Health were not qualified to provide.

141.    Dr. Clark identified claims for medical services at Whole Health that were not documented as having occurred, or for higher levels of service than the medical record indicates were provided (also known as upcoding).

142.    Finally, Dr. Clark found that LIGOTTI and his staff at Whole Health regularly prescribed controlled substances and other medications of abuse, diversion, and addiction outside of the legitimate practice of medicine, and while ignoring possible evidence of diversion.

### LIGOTTI's Recent Conduct and Liquidation of Assets

143.    LIGOTTI has known that he and his conduct related to Whole Health have been under investigation since he was served with a Grand Jury Subpoena for records from Whole Health in or around October 2016. After recent FBI interviews of current and former employees, LIGOTTI has made multiple efforts to liquidate his assets and shut down Whole Health. Based on

my knowledge, training, and experience, I know that individuals under criminal investigation, specifically white collar criminals, frequently liquidate assets, hide assets, close or significantly change the business conducting the fraud, and utilize other individuals to conceal money or property obtained as a result of fraudulent conduct.

144.    On or about May 1, 2020, LIGOTTI's wife applied for an approximately $196,647 loan for Whole Health from the federal Paycheck Protection Program (the "PPP Loan").[6] The PPP loan, intended to cover Whole Health's payroll expenses estimated at roughly $78,658.80 per month, was approved and disbursed by the Small Business Administration ("SBA") and a financial institution/lender on or about June 22, 2020.

145.    On or about May 6, 2020, LIGOTTI's primary residence, 717 Seagate Dr., Delray Beach, FL 33483, was listed for sale with an asking price of $5,695,000. This property was purchased in 2014 by LIGOTTI and his wife. Analysis of a Whole Health Bank of America account ending in 0135 ("Whole Health BOA Account") for the period from 2013 to the present

---

[6]    The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program (defined previously as "PPP"). In or around April 2020, over $300 billion in additional PPP funding was authorized by Congress.

In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, which is signed by an authorized representative of the business. The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures are used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses. A PPP loan application must be processed by a participating financial institution (the lender). If a PPP loan application is approved, the participating financial institution funds the PPP loan using its own monies, which are 100% guaranteed by Small Business Administration ("SBA"). Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan.

PPP loan proceeds must be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time after receiving the proceeds and uses a certain amount of the PPP loan proceeds on payroll expenses.

reflects that it consistently received payments from healthcare companies, which are proceeds of this health care fraud scheme. During the relevant time period, over $1,000,000.00 was paid from the Whole Health BOA Account toward the deposit for the purchase of and continued mortgage payments on this property.

146.   Another residential property owned by LIGOTTI, located at 3860 Lone Pine Rd., Delray Beach, FL 33445, and believed to be occupied by LIGOTTI family member(s), has been on the market since on or around June 7, 2018, and has a current asking price of $799,000. This property was purchased by LIGOTTI and his wife in 2007. In 2013, over $75,000 was paid from the Whole Health BOA Account toward the mortgage on this property. Between 2013 and the present, LIGOTTI was paid approximately $14,189,667.35 into his personal BOA account ending in 3646 from the Whole Health BOA Account.  During that same timeframe LIGOTTI's personal BOA account ending in 3646 paid over $550,000 toward the mortgage on this property.

147.   On or about May 28, 2020, the property where Whole Health is located, 402 SE 6th Ave., Delray Beach, FL 33483, was listed for sale with an asking price of $3,999,999. This property was purchased by 3 STAR LLC, a company whose managing members are LIGOTTI and his wife, in 2013. That year, LIGOTTI made an initial deposit payment for the purchase of this property from his personal BOA account in the amount of approximately $47,500.

148.   A typical winding down of a medical practice would involve the sale of the practice, including the sale of the assets, accounts receivable, and goodwill associated with the practice. Here, LIGOTTI appears to simply be shuttering Whole Health without transferring the practice and its assets to another provider.

149.    On or about July 13, 2020, LIGOTTI notified his patients via letter that Whole Health would be closing on August 7, 2020. The following day, LIGOTTI placed an ad in the Palm Beach Post advertising the closure.

150.    Also on or about July 13, 2020, a settlement conference was held on a civil lawsuit between LIGOTTI/Whole Health and the private insurance company United Health Care (previously defined herein as "UHC"). LIGOTTI/Whole Health filed a civil suit against UHC in 2016 asserting that UHC withheld payment on claims submitted by LIGOTTI/Whole Health. UHC and LIGOTTI/Whole Health reached an impasse at the settlement conference.

151.    On or about July 15, 2020, LIGOTTI and his wife (collectively "the LIGOTTIS") filed a Chapter 11 Voluntary Bankruptcy Petition (the "Petition) (*In re Ligotti*, No. 20-bk-1766 (Bankr. S.D. Fla. July 15, 2020) (Mora, M.).

152.    The Petition was technically deficient in a number of ways. First, the Petition did not attach the following required forms: Form 106Sum, Summary of Your Assets and Liabilities and Certain Statistical Information; Form 106A/B Schedule A/B Property; Form 106C, Schedule C, The Property You Claim as Exempt; Form 106D, Schedule D, Creditors Who Hold Claims Secured by Property; Form 106E/F, Schedule E/F, Creditors Who Have Unsecured Claims; Form 106G, Schedule G, Executory Contracts and Unexpired Leases; Form 106H, Schedule H, Your Codebtors; Form 106I, Schedule I, Your Income; Form 106J, Schedule J, Your Expenses. Additionally, the LIGOTTIS did not file a Declaration Concerning Debtor's Schedules, Statement of Financial Affairs, and Statement of Current Monthly Income.

153.    While the Bankruptcy Court has granted the LIGOTTIS until July 29, 2020 to cure these deficiencies, there are facts within the current Petition that law enforcement has reason to believe are potentially false based upon the investigation into the LIGOTTIS' financial affairs.

154.    In the Petition, the LIGOTTIS estimate that their assets are worth between $100,001 - $500,000.

155.    In the Petition, the value of the property located on Lone Pine Road is listed as $0. The outstanding mortgage balance on this property is listed as $695,000. This property is currently on the market for $799,000. The LIGOTTIS list the mortgage on this property as an unsecured claim of $695,000. Not only is the value of the property grossly understated, but the fact that there is likely equity is not accurately represented by the LIGOTTIS to the Bankruptcy Court.

156.    Similarly, the LIGOTTIS list the value of their primary residence located on Seagate Drive as $0. The outstanding balances of the two mortgages on this property total $3,634,403. Again, with the property value listed as $0 and the property on the market for $5,695,000, there is likely equity on this home.

157.    The filing of this incomplete and inaccurate Petition potentially suggests that the LIGOTTIS were in a rush to receive the protections afforded by the automatic stay of any creditors' efforts to collect afforded to them under section 362 of the United States Bankruptcy Code.

158.    Furthermore, the Petition does not provide a full or accurate picture of the LIGOTTIS' wealth. The LIGOTTIS own multiple corporations which money is filtered through, including: 3 STAR, LLC (which owns the Whole Health office building); WHOLE HEALTH, LLC; KRUGER INDUSTRIAL SMOOTHING, LLC (a shell corporation unrelated to industrial smoothing, named after a corporation from the 1990's sitcom "Seinfeld"); and CML ENTERPRISE, LLC (a company which has a 50% ownership interest in a treatment center in Ohio).

159.    In sum: (1) Whole Health requested and received nearly $200,000 via the PPP on June 22, 2020, (2) the LIGOTTIS have listed three properties for sale which, if sold for near asking

price, would yield $10 million, with the LIGOTTIS likely recouping some equity invested in these properties, (3) LIGOTTI has announced plans to completely close Whole Health with just four weeks' notice to patients, without any apparent attempt to sell the assets and goodwill associated with the business; and (4) the LIGOTTIS filed an incomplete, inaccurate individual Chapter 11 Petition that may have been filed in order to invoke an automatic stay of debt collection efforts.

160.    Based on our knowledge, training, and experience, the law enforcement team investigating this matter has reason to believe that the LIGOTTIS have taken these actions in an attempt to hide assets, confuse and mislead law enforcement and creditors, and/or as preparatory steps to fleeing this district. Their recent actions, specifically the closure of Whole Health and listing of their primary residence for sale, necessitate immediate response by law enforcement to prevent further divestment of assets and, potentially, flight from this jurisdiction.

**There is Probable Cause to Believe Evidence Will Be Found at Whole Health and in LIGOTTI's Cellular Telephone**

161.    Healthcare providers are required by private insurance companies and Medicare to maintain records for all patients for which treatment was rendered. In addition, based on my knowledge, training and experience, and the experience of other law enforcement officers assisting in this investigation, I know that healthcare providers sometimes keep evidence of a crime, property used to facilitate the crime at the addresses where they practice.

162.    Based on my knowledge, training, and experience, and the experience of other law enforcement officers assisting in this investigation, I know that individuals involved in illegal distribution of controlled substances often keep evidence of a crime and property, such as controlled substances, prescription pads, ledgers, receipts, contact information of associates, notes, and cash at the places in which they do business.

163.    During a routine patient visit in July 2020, CW1 saw that his/her patient chart from his/her medical file was within the Whole Health office, located at 402 SE 6th Ave., Delray Beach, FL 33483.

164.    On or around July 13, 2020, LIGOTTI sent his patients a letter notifying them that Whole Health would be closing on August 7, 2020. The letter stated that patient records would be forwarded by Whole Health to the patient's new practitioner upon the patient signing a release.

165.    On or around July 14, 2020, LIGOTTI posted an ad in the Palm Beach Post announcing the closure of Whole Health and advising patients to contact the office for copies of medical records.

166.    According to open source information, LIGOTTI's cell phone number is (561) 809-7960. Also, a cellphone belonging to CD6, who knows that he is a target of the U.S. Attorney's Office and the FBI for various federal crimes, but has not yet been charged, lists "MICHAEL LAGOTTI"[sic] and "drligotti@gmail.com" as the contact associated with this phone number.

167.    A review of AT&T subscriber information for this cell phone number shows Whole Health as the "Financial Liability Party" for the account. LIGOTTI's wife is listed in AT&T records as the user. AT&T identified LIGOTTI's cell phone as an Apple iPhone XS Max, IMSI 310410216579641, IMEI 353093104988769.

168.    There is probable cause to believe that LIGOTTI's cell phone will be on his person when he is arrested. Based on my training and experience, I know that individuals with cellular phones typically keep them on or near their persons.

169.    Based on records obtained during the course of this investigation, from on or about September 2, 2015 to on or about June 25, 2020, LIGOTTI and TARGET 1 shared approximately 1,975 phone calls and approximately 669 texts. From on or about January 16, 2016 to on or about

June 26, 2020 LIGOTTI and TARGET 2 shared approximately 575 calls and approximately 1,513 texts. Based on my experience as an investigator, I know that conspirators often use text messages to communicate information related to the fraudulent conduct they are engaged in. The texts with TARGET 1 and TARGET 2 show that LIGOTTI is currently using his cell phone to communicate with his co-conspirators. Additional analysis of LIGOTTI's phone records show that LIGOTTI texted with others involved in the scheme, including but not limited to CD2 and CD3.

170.    CD5 described how he/she communicated with both LIGOTTI and TARGET 2 during his time at Whole Health as it related to the prescribing of Suboxone. Specifically, CD5 communicated via text message with LIGOTTI and TARGET 2 when a patient needed a prescription for Suboxone. CD5 would go to the facility and see patients. Then, if a patient needed Suboxone, he/she would group text LIGOTTI and TARGET 2. CD5 knew this text was essentially for TARGET 2 to call in the prescription for LIGOTTI. LIGOTTI would reply "yes" in the group text and never questioned CD5's requests.

171.    Based on my training and experience, and as further described in paragraph 174 below, I am also aware that, even when users of iPhones—such as LIGOTTI's cellular phone—delete content, computer forensic software can be used to sometimes partially or fully recovered deleted content. Accordingly, there is probable cause to believe that, even if LIGOTTI has deleted some correspondence with conspirators from his phone, its search and seizure may nonetheless yield evidence of a crime or fruits of a crime.

172.    Based upon CW1's recent visit to Whole Health, LIGOTTI's letters to patients, and LIGOTTI's newspaper announcement, there is probable cause to believe that there are patient files and instruments related to health care fraud and illegal drug distribution described above within the Whole Health office, located at 402 SE 6th Ave., Delray Beach, FL 33483. Based upon witness

reports regarding LIGOTTI's use of text messages to communicate with co-conspirators, I submit there is also probable cause that there is evidence of criminal activity, including health care fraud and illegal drug distribution, in LIGOTTI's Apple iPhone XS Max.

### Searches of Computers and Other Electronic Media

173.    As described above, and in Attachment C to the Application for a Search Warrant, this application seeks permission to search and seize records that might be found at Whole Health, in whatever form they are found. One form in which the records may be found is electronically on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media all under Rule 41(e)(2)(B).

174.    I submit that if a computer or storage medium is found in Whole Health, there is probable cause to believe records relating to the fraud scheme will be stored on that computer or storage medium, for at least the following reasons:

    a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little to no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is possible because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, the deleted data remains on the storage medium until it is overwritten by new data.

    b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the storage medium that is not

currently being used by an active file – for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media – in particular, computers' internal hard drives – contain electronic evidence of how a computer has been used, what it has been used for, and who used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating systems or application operations, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence because special software is typically required to complete the task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e.  Based on actual inspection of other evidence related to this investigation, I am aware that computer equipment was used to create and maintain electronic patient records, billing records, and laboratory records as part of the fraud scheme. Given the fraudulent billing from Whole Health and the fact that there are computer systems currently located at the physical locations of Whole Health, there is probable cause to believe that the computers were used to create fraudulent documentation to support the submission of fraudulent claims to private insurance, to create communications relating to the fraudulent claims, or to store other evidence

of the health care fraud scheme on the computer. Interviews with witnesses also show there is probable cause to believe that computers at Whole Health contain a Laboratory Information Management ("LIM") system used to manage and store information relating to fraudulent testing practices.

175.    *Forensic evidence.* As further described in Attachments C and D, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium at Whole Health because:

a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record the date files were created and the sequence in which they were created, although this information can later be falsified.

b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the

crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

a.  The process of identifying the exact files, blocks, registry entries, logs or other forms of forensic evidence on storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a team and later passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

b.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when it was used can be necessary to establish whether particular information is or is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to searching the user's intent

176.    *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage

media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

    a.   *The time required for an examination*. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable, particularly during the ongoing Covid-19 pandemic. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence, including evidence that is not neatly organized into files. Additionally, it is possible that files have been deleted or edited, but remnants of older versions are in unallocated space or slack space. This too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

    b.   *The volume of evidence.* Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. Reviewing that information for things described in the warrant can take weeks or months, depending on the

volume of data stored, and would be impractical and invasive to attempt on-site.

c.  *Technical requirements*. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

d.  *Variety of forms of electronic media*. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools

177.   A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates,

appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

178.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensic tools.

179.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, as well as LIGOTTI's Apple iPhone XS Max, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## **Biometric Features**

180.    The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

> a.    I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops,

offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.  If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID. According to apple.com, the model of iPhone used by LIGOTTI, the Apple iPhone XS Max, uses Face ID.

c.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are

engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

d.  This affidavit seeks authorization to search LIGOTTI's iPhone XS Max cellular telephone. The passcode or password that would unlock this device is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device, making the use of biometric features necessary to the execution of the search authorized by this warrant.

e.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

f.  Due to the foregoing, the warrant I am applying for would permit law enforcement personnel to hold LIGOTTI's Apple iPhone XS Max, more particularly identified in Attachment B, in front of LIGOTTI's face and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

**Forfeiture of Properties**

181.    Based upon on information provided by the United States Attorney's Office for the Southern District of Florida, I am aware that certain property is subject to criminal forfeiture to the United States upon LIGOTTI's conviction of the offenses alleged in this Affidavit.

182.    Upon conviction of a violation of 18 U.S.C. §§ 1347 or 1349, as alleged in this Affidavit, LIGOTTI shall criminally forfeit to the United States of America any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to 18 U.S.C. § 982(a)(7).

183.    Therefore, the property that is subject to criminal forfeiture upon LIGOTTI's conviction of the violations alleged in this Affidavit includes, but is not limited to, the following real properties, including all buildings, improvements, fixtures, attachments and easements found therein or thereon, which are known and numbered as follows:

        a.  717 Seagate Drive, Delray Beach, Florida 33483;

        b.  3860 Lone Pine Road, Delray Beach, FL 33445; and

        c.  402 SE 6th Avenue, Delray Beach, FL 33483.

**CONCLUSION**

184.    Based upon the foregoing, I submit that this affidavit sets forth sufficient facts to establish probable cause to believe that, from on or about January 1, 2013 and continuing through the date of this affidavit, in Palm Beach and Broward Counties, in the Southern District of Florida, and elsewhere, DR. MICHAEL LIGOTTI, together with employees of Whole Health, and other addiction treatment center owners, sober home owners, and laboratory personnel, and others known and unknown, conspired to commit (a) health care fraud, that is, to knowingly and willfully execute, and attempt to execute, a scheme to defraud any health care benefit program and to obtain,

by means of false and fraudulent pretenses, representations, and promises, any of the money and property owned by, and under the custody and control of, any health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347, and (b) wire fraud, that is, having devised a scheme or artifice to defraud, transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice; all in violation of Title 18, United States Code 1349.

185.    I further submit that there is probable cause to conclude that documents, other files, and physical objects related to LIGOTTI and his associates' fraudulent business activities, as described above and throughout this affidavit, are located at Whole Health (402 SE 6th Avenue, Delray Beach, Florida 33483), in electronic media contained therein, and in LIGOTTI's wireless cellular telephone, as described in Attachments A-D hereto.

FURTHER AFFIANT SAYETH NAUGHT.


SA Christo Hall
CHRISTIAN HULL
Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before me
this 29 day of July, 2020.


BRUCE REINHART
UNITED STATES MAGISTRATE JUDGE

## <u>ATTACHMENT A</u>

*Property to be searched*

The property to be searched is Whole Health LLC, located at 402 SE 6th Ave, Delray Beach, Florida 33483, in Palm Beach County.







## ATTACHMENT B

The property to be searched is an Apple iPhone XS Max cellular telephone, identified by International Mobile Subscriber Identity (IMSI) 310410216579641, International Mobile Station Equipment Identity (IMEI) 353093104988769, and associated with AT&T telephone number (561) 809-7960.

This warrant authorizes the forensic examination of the device for the purpose of identifying the electronically stored information described in Attachment C.

## ATTACHMENT C: ITEMS TO BE SEIZED FROM WHOLE HEALTH

The items described below **from January 1, 2013 to the present**:

1.  All of MICHAEL LIGOTTI's ("LIGOTTI") or WHOLE HEALTH ("WH") records related to the submission of claims to insurance programs, including but not limited to, claim forms, remittance advice forms, payment records, copies of explanation of benefit forms, records showing the receipt of payments, correspondence, whether they are in paper or electronic format;

2.  Any and all health care billing manuals, coding books, bulletins, and updates;

3.  Documents, manuals, instructional materials, related to the treatment of addiction and associated bodily fluid testing and treatment;

4.  Any and all financial records, documents, and materials related to LIGOTTI and WH, including but not limited to correspondence, bank records, checkbooks, copies of checks, check stubs, check registers, vouchers, invoices, journals, wire transfers, canceled checks, loan records and records of transfers of funds; tax returns and related documents; and other financial records establishing the disposition of income;

5.  Organizational charts;

6.  Patient files, including, but not limited to the patients listed in Exhibit 1 to Attachment C, which is attached hereto;

7.  Any and all corporate records for LIGOTTI owned or controlled entities and WH, including but not limited to corporate documents and all amendments thereto and all minutes of Board of Director meetings;

8.  Any and all company training materials, manuals, client lists, marketing materials, policies or directives relating to the administration of or billing for sober homes, detoxification, intensive outpatient programs, partial hospitalization programs, laboratories, and hospitals, applicable to employees, agents, independent contractors, representatives, sales persons, or marketers in the performance of their duties;

9.  Any and all accounting records for LIGOTTI and WH, including but not limited to all general and subsidiary ledgers, including balance sheets, income statements, financial statements, work papers, check registers, expense reports and all underlying documentation from January 1, 2013 to the present;

10. Any and all personnel and payroll records of those employees, agents, independent contractors, or representatives related to, paid by or associated with LIGOTTI or WH. Such personnel records may include employment agreements, contracts, correspondence, application, resumes, records of position held, job descriptions, telephone numbers, records of remuneration or wages, and other documents that reflect the names and identifying information

of employees, agents, independent contractors, and representatives, from January 1, 2013 to the present;

11.     Communication between amongst LIGOTTI, any employees, agents, or contractors of WH, and any therapists, clinical directors, nurses, physician assistants, managers, owners or other health care workers that are either employed by or act as agents of a sober home, addiction treatment center, laboratory, or hospital;

12.     Applications for licensure and documents related to licensure;

13.     Wire transfer records, postal money orders and/or commercial money orders, checks and other monetary instruments;

14.     Cellular telephones;

15.     Computers, hard drives, or other physical object upon which computer data can be maintained;

16.     Any information regarding LIGOTTI and WH employees', agents', or contractor's schedules or travel;

17.     For any computer, computer hard drive, or other physical object upon which computer data can be recorded or maintained (hereinafter, "COMPUTER") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

   a.     All electronic records and data relating to LIGOTTI or WH's patients or business associates;

   b.     Logs, registry entries, configuration files, usernames and passwords, documents, browsing history, user profiles, email, email contacts, chats, instant messaging logs, photographs, and correspondence evidencing who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted;

   c.     evidence of software that would allow others to control the COMPUTER, such as Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   d.     evidence of the lack of such malicious software;

   e.     evidence of the attachment to the COMPUTER of other storage devices or similar containers of electronic evidence;

   f.     evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

   g.     passwords, encryption keys, and other access devices that may be necessary to  access the COMPUTER;

h.      documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

i.      contextual information necessary to understand the evidence described in this attachment.

The term "COMPUTER" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form ( such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, prints, slides, negatives, videotapes, motion pictures, or photocopies).

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

### Addendum to Attachments C and D

With respect to law enforcement's review of the seized material identified in Attachment C and D, law enforcement (*i.e.*, the federal agents and prosecutors working on this investigation and prosecution), along with other government officials and contractors whom law enforcement deems necessary to assist in the review of the seized material (collectively, the "Review Team") are hereby authorized to review, in the first instance, the seized material.

If, during the review of the seized material, the Review Team finds potentially privileged materials, the Review Team will: (1) immediately cease its review of the potentially privileged materials at issue; (2) segregate the potentially privileged materials at issue; and (3) take appropriate steps to safeguard the potentially privileged materials at issue.

Nothing in this Instruction shall be construed to require the Review Team to cease or suspend review of all the seized material upon discovery of the existence of potentially privileged materials within a portion of the seized material.

**EXHIBIT 1**













## ATTACHMENT D: ITEMS TO BE SEIZED FROM CELLULAR TELEPHONE

The records described below **from January 1, 2013 to the present**:

1. Records, information, and communications, including text messages and email correspondence, related to the testing and treatment of patients provided by LIGOTTI, WH, testing laboratories, addiction treatment facilities, and sober homes;

2. Records, information, and communications related to the submission of claims to insurance programs, including but not limited to, claim forms, remittance advice forms, payment records, copies of explanation of benefit forms, records showing the receipt of payments, and correspondence;

3. Records, information, and communications relating to documents, manuals, and instructional materials related to the treatment of addiction and associated bodily fluid testing and treatment;

4. Any and all financial records, documents, and materials related to LIGOTTI and WH, including but not limited to text messages and email correspondence, bank records, vouchers, scans of checks, invoices, journals, wire transfers, loan records and records of transfers of funds; tax returns and related documents; and other financial records establishing the disposition of income;

5. Records, information, and communications relating to organizational charts;

6. Patient files, including, but not limited to the patients listed in Exhibit 1 to Attachment C;

7. Any and all records and communications relating to LIGOTTI-owned or controlled entities and WH, including but not limited to corporate documents and all amendments thereto and all minutes of Board of Director meetings;

8. Any and all records, information, or communications, including text messages and email correspondence, relating to company training materials, manuals, client lists, marketing materials, policies or directives relating to the administration of or billing for sober homes, detoxification, intensive outpatient programs, partial hospitalization programs, laboratories, and hospitals, applicable to employees, agents, independent contractors, representatives, sales persons, or marketers in the performance of their duties;

9. Any and all records, information, or communications, including text messages and email correspondence, regarding accounting for LIGOTTI and WH, including but not limited to balance sheets, income statements, financial statements, work papers, expense reports and all underlying documentation from January 1, 2013 to the present;

10. Communication, including text messages and email correspondence, between amongst LIGOTTI, any employees, agents, or contractors of WH, and any therapists, clinical directors, nurses, physician assistants, managers, owners or other health care workers that are either employed by or act as agents of a sober home, addiction treatment center, laboratory, or hospital;

11.     Records, information, and communications relating to LIGOTTI and WH employees', agents', or contractor's schedules or travel; and

12.     Evidence of user attribution showing who used the device described in Attachment B.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form ( such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, prints, slides, negatives, videotapes, motion pictures, or photocopies).

During the execution of the search of the device described in Attachment B, law enforcement personnel are authorized to hold the device specified in Attachment B in front of the face of Michael LIGOTTI to activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

### Addendum to Attachments C and D

With respect to law enforcement's review of the seized material identified in Attachment C and D, law enforcement (*i.e.*, the federal agents and prosecutors working on this investigation and prosecution), along with other government officials and contractors whom law enforcement deems necessary to assist in the review of the seized material (collectively, the "Review Team") are hereby authorized to review, in the first instance, the seized material.

If, during the review of the seized material, the Review Team finds potentially privileged materials, the Review Team will: (1) immediately cease its review of the potentially privileged materials at issue; (2) segregate the potentially privileged materials at issue; and (3) take appropriate steps to safeguard the potentially privileged materials at issue.

Nothing in this Instruction shall be construed to require the Review Team to cease or suspend review of all the seized material upon discovery of the existence of potentially privileged materials within a portion of the seized material.